O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA B. G., <br><br> Plaintiff, <br><br> v. <br><br> NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] <br><br> Defendant. | Case No. 2:17-cv-06664-KES <br><br> MEMORANDUM OPINION AND ORDER |

# I.

# BACKGROUND

In March 2013, Ana B. G. ("Plaintiff") filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB") alleging a disability onset date of January 10, 2008, when she stopped working due to back pain. Administrative Record ("AR") 45, 156-61, 162-72.

On December 15, 2015, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified,

---

[1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security."

as did a vocational expert ("VE").  AR 38-74.

On March 25, 2016, the ALJ issued a decision denying Plaintiff's applications.  AR 18-37.  The ALJ found that Plaintiff suffered from the medically determinable severe impairments of degenerative changes of the cervical spine, degenerative disease of the lumbar spine with facet hypertrophy, hypercholesterolemia/dyslipidemia, hypertension, rheumatoid arthritis, lupus, coronary artery disease, and obesity.  AR 23.

Despite these impairments, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform less than a full range of light work, as follows:

> The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently.  The claimant can stand/walk 6 hours in an 8-hour workday.  The claimant can sit 6 hours in an 8-hour day.  The claimant can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds.  She can occasionally balance, stoop, kneel, crouch, and crawl.  She should avoid working around unprotected heavy machinery or unprotected heights.  She should work in an indoor work environment.

AR 27, citing 20 C.F.R. §§ 404.1567; 416.967.

Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff could perform her past relevant work as an order puller at a warehouse. AR 30, 67.  The ALJ concluded that Plaintiff was not disabled.  AR 32.

## II.
## STANDARD OF REVIEW

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue,

481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

## III.
## ISSUES PRESENTED

Issue One: Whether the ALJ erred in finding that Plaintiff's fibromyalgia is not a medically determinable severe impairment.

Issue Two: Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony.

(Dkt. 26, Joint Stipulation ["JS"] at 4.)

## IV.
## DISCUSSION

A. **ISSUE ONE: Fibromyalgia.**

    **1. Step Two of the Sequential Evaluation Process.**

At the second step of the five-step sequential evaluation process in assessing

whether a claimant is disabled, the Commissioner must determine whether a claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Social Security Ruling ("SSR") 85-28, 1985 SSR LEXIS, governs the evaluation of whether an alleged impairment is severe:

> An impairment or combination of impairments is found "not severe" … when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work … i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities. …
>
> If such a finding [of non-severity] is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process.

SSR 85-28, 1985 SSR LEXIS 19 at *7-12.

The claimant's burden at step two is relatively light. The Ninth Circuit has held that "the step two inquiry is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). Thus, "[a]n impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'" Id. (citing SSR 85-28, 1985 SSR LEXIS 19; Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28)).

### 2. The ALJ's Evaluation of the Relevant Evidence.

The ALJ considered Plaintiff's allegations of scoliosis, diminished left-eye vision, dermatitis, echogenic liver, dizziness, right knee pain, anxiety, and depression; the ALJ determined that none of these impairments were "severe"

within the meaning of the regulations. AR 25-26.

The ALJ noted that Plaintiff had been diagnosed with rheumatoid arthritis and lupus in November 2015. AR 28, citing AR 541. In December 2014, she was also diagnosed with myalgia, i.e., muscle pain. Id., citing AR 466-67. Regarding fibromyalgia, the ALJ found as follows:

> Although notations dated December 2014 indicate that 18 out of 18 fibromyalgia tender points were positive (AR 467) the undersigned finds that the record does not establish fibromyalgia. Fibromyalgia is a disorder defined by the American College of rheumatology ("ACR") and the Social Security Administration recognizes it as a medically determinable impairment if there are signs that are clinically established by the medical record. The primarily excepted signs are so-called "tender points." The ACR defines the disorder in patients as "widespread pain in all four quadrants of the body for a minimum duration of 3 months and at least 11 of the 18 specified tender points that cluster around the neck and shoulder, chest, hip, knee, and elbow regions." Other typical symptoms, some of which can be signs if they are clinically documented over time, are irritable bowel syndrome, chronic headaches, temporomandibular joint dysfunction, sleep disorder, severe fatigue, and cognitive dysfunction. It is widely accepted, however, that the tender point test is the indispensable diagnostic requirement; without it, there is no valid diagnosis of fibromyalgia. In this case, the notations generally indicate that 18 out of the 18 fibromyalgia tender points were positive, but it does not specify the actual tender points on the body nor does it indicate their distribution among the required areas. Accordingly, the undersigned finds that the claimant's fibromyalgia is not a medically determinable impairment.

AR 28, n.3.

The cited record is a "visit note" by treating rheumatologist Dr. Jeremy Anuntiyo. AR 466-68. He wrote that Plaintiff presented as a "new patient" to be evaluated for "rheumatologic disorder." AR 466. He directed a "work up" for lupus and rheumatoid arthritis, two conditions with which Plaintiff was later diagnosed. Id. During this new patent visit, Plaintiff reported muscle pain but denied muscle weakness and dizziness. Id. Dr. Anuntiyo examined Plaintiff and found "all 28 joints tender" and "all 18 out of 18 fibromyalgia tender points positive." AR 467. He diagnosed Plaintiff with inflammatory polyarthropathy (a general term for a family of conditions including rheumatoid arthritis), abnormal immunology finding, and "myalgia" for which he prescribed gabapentin, a medicine used to treat nerve pain and seizures.[2] Id.

### 3. Analysis of Claimed Error.

Plaintiff argues that the ALJ erred by finding that the "record does not establish fibromyalgia" because Dr. Anuntiyo did "not specify the actual tender points on the body nor … indicate their distribution among the required areas." (JS at 6, citing AR 28, n.3.) Plaintiff points out that the 18 tender points used to diagnosis fibromyalgia have defined locations. See Social Security Ruling ("SSR") 12-2p (defining the 18 tender points); see also https://www.mayoclinic.org/tender-points/img-20007586 (defining the same 18 tender points). Dr. Anuntiyo therefore did not need to specify the location of the positive tender point findings.

Defendant counters that SSR 12-2p provide guidelines for determining when fibromyalgia is a medically determinable impairment. (JS at 8.) ALJs will find fibromyalgia a medically determinable impairment where the claimant has (1) pain

---

[2] Gabapentin is also sold under the brand name Neurontin. See https://www.pfizer.com/products/product-detail/neurontin.

in all quadrants of the body that has persisted at least 3 months, (2) at least 11 positive tender points found bilaterally and both above and below the waist, and (3) evidence that other disorders that could cause the symptoms were excluded. SSR 12-2p § II(A). Rheumatologic disorders are given as an example of other disorders that could cause similar pain symptoms. SSR 12-2p n.7. Defendant argues that the ALJ's finding that the record does not establish fibromyalgia was correct, because Plaintiff failed to satisfy the third part of this three-part test – she cannot exclude rheumatoid arthritis as the cause of her pain. (JS at 8.) More fundamentally, Defendant argues that even if the ALJ erred in failing to characterize Plaintiff's fibromyalgia as a severe, medically determinable impairment, it was harmless error, because the ALJ assessed a restrictive RFC and no medical evidence shows that Plaintiff has greater functional limitations than those set forth in the RFC. (JS at 8-9.)

The Court agrees with Plaintiff that the ALJ's stated reason for discounting Dr. Anuntiyo's tender point findings is not supported by substantial evidence. Dr. Anuntiyo found that *all* 18 tender points were positive. Assuming that he used the standard 18 tender points (and given his reference to "18" tender points and his specialty in rheumatology, that assumption is reasonable), the locations of his positive tender points are clear, and they necessarily pertain to both sides of the body both above and below the waist.

The Court agrees with Defendant, however, that any error in the ALJ's stated reason was harmless. The ALJ recognized that Plaintiff suffered from the severe medically determinable impairments of degenerative disc disease, rheumatoid arthritis, lupus, and obesity. AR 24. See Buck v. Berryhill, 869 F.3d 1040, 1048-49 (9th Cir. 2017) ("Step two is merely a threshold determination meant to screen out weak claims. . . . It is not meant to identify the impairments that should be taken into account when determining the RFC. . . . The RFC therefore should be exactly the same regardless of whether certain impairments are

considered "severe" or not. . . . [S]tep two was decided in Buck's favor after both hearings. He could not possibly have been prejudiced. Any alleged error is therefore harmless and cannot be the basis for a remand."). Plaintiff has not identified any functional limitations uniquely caused by fibromyalgia as opposed to these other conditions. Plaintiff has not cited any medical source opinion that she cannot work at the exertional level specified in the assessed RFC, i.e., a reduced range of light work.

Plaintiff argues that the error was not harmless because the ALJ would have evaluated her subjective symptom testimony differently if the ALJ had found that she suffers from fibromyalgia. (JS at 7.) As discussed below, the ALJ gave clear and convincing reasons for discounting Plaintiff's subjective symptom testimony that did not depend on labeling Plaintiff's condition with any specific diagnosis.

B. **ISSUE TWO: Plaintiff's Subjective Symptom Testimony.**

**1. Rules for Evaluating Subjective Symptom Testimony.**

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

If the ALJ finds testimony as to the severity of a claimant's pain and impairments is unreliable, "the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). In doing so, the ALJ may consider testimony from physicians "concerning the nature, severity, and effect of the symptoms of which [the claimant] complains." Id. at 959. If the ALJ's credibility finding is supported by

substantial evidence in the record, courts may not engage in second-guessing. Id.

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014). The ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. Smolen, 80 F.3d at 1283-84 & n.8. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

**2. Summary of Plaintiff's Subjective Symptom Testimony.**

At the time of the hearing, Plaintiff lived with her husband, four children ranging in age from 14 to 23, and her baby granddaughter. AR 43, 60.

Plaintiff suffered a work-related injury in 2003. AR 46. She "started feeling a lot of pain" and had left shoulder surgery on a torn tendon. AR 46-47. She also experienced back pain which was initially treated with physical therapy around

2003.  AR 48.  After her worker's compensation benefits stopped, her only treatment for back pain was medication.  Id.  She continued working until January 2008.  AR 45.  At the time of the hearing, her only pain medication was prescription ibuprofen which she testified provided some temporary relief.  AR 50-51.

Plaintiff testified that she has "body ache" pain "every single day."  AR 55.  The main problem that keeps her from working is "pain all over [her] body."  AR 58.  Due to pain, she could not stand for long periods and needed a break every 10 or 15 minutes.  AR 57, 62.  She would get cramps after standing 10 or 15 minutes.  AR 62.  She could sit for 20 minutes at which point she experienced cramps and muscle stiffness and would need to stand.  AR 63.  To avoid dizziness, she must stand for approximately two minutes before starting to walk.  Id.  She could only walk one block, which would take her 4 to 10 minutes, before needing to rest.  Id.  When she tried activities such as sweeping or climbing stairs, she became short of breath.  AR 52.

She can, however, drive and daily drives her teenage children approximately 10 to 15 minutes to and from school.  AR 44, 65.  She goes outside every day (AR 209) which requires her to walk up and down four stairs.  AR 65.  She expressed frustration that she had seen "2 or 3 doctors" and "the only thing they gave" her for pain was ibuprofen.  AR 59.

On June 10, 2013, Plaintiff completed a pain questionnaire.  AR 204-05.  Plaintiff indicated that her pain was caused or made worse by "standing, walking, [or] sitting for [a] long time."  AR 204.  She clarified that pain develops after 20 minutes of standing, sitting, or walking.  AR 205.  Her pain is relieved or improved by ibuprofen or rest.  Id.  She had purchased ibuprofen only one month before completing the questionnaire.  Id.  She reported that it caused side effects, but she did not describe them.  Id.

In her Adult Function Report, Plaintiff described her daily activities as

driving her kids to and from school, cooking, cleaning, resting, taking medicine, and showering. AR 206. She had no problems with personal care. AR 207. She spent approximately one hour each day cooking for herself and her family, and her cooking habits had not changed due to her conditions. AR 208. She ccould perform ironing, laundry, cleaning, and other household tasks with rest every 15 to 20 minutes. AR 208. She went out every day; she could drive a car, shop in stores, and handle money. AR 209. She identified "walking" and "volleyball" as hobbies in which she engaged three times a week.[3] AR 210.

At the consultative psychiatric evaluation, Plaintiff told Dr. Parikh that she could cook, shop, housekeep, and get her younger children ready for school each morning. AR 368. At the consultative internal medicine evaluation, Plaintiff told Dr. Ella-Tomayo that she could walk fifteen minutes and lift ten pounds. AR 358.

### 3. The ALJ's Evaluation of Plaintiff's Subjective Symptom Testimony.

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ determined that her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the evidence. AR 27. The ALJ gave at least four reasons for discounting Plaintiff's subjective symptom testimony: (1) lack of supporting objective medical evidence, (2) inconsistency with daily activities, (3) inconsistency with medical evidence, and (4) history of conservative treatment. AR 28-30.

The lack of supporting objective medical evidence is a factor that ALJs may consider when evaluating subjective pain testimony, but a claimant's testimony cannot be rejected solely because it is not fully corroborated by objective medical

---

[3] Plaintiff may have meant that she previously engaged in these hobbies but now "walks every week only if need to." AR 210.

11

evidence. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001). The Court therefore considers the ALJ's other three reasons.

### a. Inconsistency with Daily Activities.

ALJs may consider inconsistencies between a claimant's admitted activities and her allegations of disabling limitations when evaluating her testimony. 20 C.F.R. § 404.1527(c)(3)(i) (daily activities relevant when assessing credibility); Valentine v. Astrue, 574 F.3d 685, 694 (9th Cir. 2009) (finding activities such as exercise, gardening, and community activities "did suggest that [the claimant's] later claims about the severity of his limitations were exaggerated").

The ALJ characterized Plaintiff as engaging in a wide range of activities of daily living. AR 30. The ALJ found that many of the physical and mental abilities required to perform these activities are the same as those necessary for obtaining and maintaining employment. Id.

Plaintiff's daily activities are inconsistent with her claim to suffer from constant pain that prevents her from standing more than 10 or 15 minutes, sitting more than 20 minutes, or walking more than 1 block. Plaintiff's ability to cook daily meals remains unchanged; cooking and washing dishes generally requires standing. AR 208. Shopping for an hour (AR 209) would generally require walking or standing for an hour, even if leaning on a cart. Driving her teenagers to and from school would require sitting for the duration of the drive, yet Plaintiff did this every school day and still performed cooking and other household chores on a daily basis. Ultimately, Plaintiff could cook, clean, shop, and manage her household for herself and her four children. She would take regular rest breaks while doing these chores, but an 8-hour workday includes regular rest breaks.

Regarding lifting, Plaintiff testified that she could lift maybe 10 or 15 pounds. AR 62, 358. The ALJ also noted that Plaintiff complained in August 2014 of rib pain that had lasted "for a long time," but told her doctor that "she was doing heavy lifting." AR 30, citing 581. Plaintiff argues that this statement is too

12

vague to support a finding that Plaintiff was engaged in lifting inconsistent with her testimony. (JS at 15.) While "heavy lifting" is not a precisely defined term, most people would understand it to mean lifting something heavier than 10 or 15 pounds.

In sum, the ALJ's finding of inconsistency is supported by substantial evidence and provides a clear and convincing reason to discount Plaintiff's subjective symptom testimony.

### b. Inconsistency with Medical Evidence.

The ALJ described Plaintiff's March 2014 consultative internal medicine examination. AR 28. At that examination, Plaintiff had some back pain on flexion at 70/90 degrees, but had no difficulty getting on and off the examination table. Id., citing AR 361. The straight leg raising test was negative bilaterally, her gait was normal, and the consultative examiner, Dr. Ella-Tamayo, assessed that Plaintiff had normal neurological functions and motor strength. Id. Dr. Ella-Tamayo opined that Plaintiff could stand or walk for 6 hours per day and that her sitting was unrestricted. AR 361.

The ALJ accurately summarized Dr. Ella-Tamayo's report. Dr. Ella-Tamayo's observations of normal motor strength, normal range of motion for most joints, normal gait, normal results from the straight leg raising test, and no difficulty getting on and off the examination table are inconsistent with Plaintiff's testimony that she can only stand for 10 or 15 minutes at a time and only walk for 15 minutes. This inconsistency supports the ALJ's decision to discount Plaintiff's subjective symptom testimony.

### c. History of Conservative Treatment

ALJs may consider whether a claimant's history is consistent with the level of alleged impairment when weighing a claimant's subjective complaints. See 20 C.F.R. § 404.1529(c)(3)(iv), (v) (treatment and medication regimen relevant to credibility). The Ninth Circuit has explicitly stated that "evidence of 'conservative

treatment' is sufficient to discount a claimant's testimony regarding the severity of an impairment." Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).

The ALJ discussed Plaintiff's treatment for back pain, rheumatoid arthritis, and cardiovascular impairments. AR 28-29. The ALJ found that Plaintiff received "minimal treatment" in 2014 and 2015. AR 28, citing AR 376-451 (records from 2009-2013), AR 452-59 (2014 Sunshine Medical Clinic records re Ob-Gyn referral, back pain treated with ibuprofen [AR 453], and lab results), AR 460-521 (2014 and 2015 records from Dr. Anuntiyo consisting mostly of lab results), and AR 575-88 (2014 and 2015 Sunshine Medical Clinic records).

Regarding back pain, the ALJ described Plaintiff's treatment history as follows:

> [T]he claimant has received relatively mild and conservative treatment. During her course of treatment, the claimant was only given pain medication, which is not indicative of disability level impairments. No other more invasive or drastic treatment plan was recommended, such as epidural injections or surgery. In fact, the record does not even show that the claimant underwent more conservative treatment modalities such as chiropractic treatments, physical therapy or acupuncture.

AR 28.

Regarding rheumatoid arthritis, the ALJ noted that Plaintiff's only treatment was two Remicade injections[4] around October 2015. Id., citing AR 49-50, 575. Per an October 19, 2015 treating note, Plaintiff wanted a "ref[erence] for rheumatology / been seen by Dr. Anuntiyo on Remicade inj[ections] x 2 wks /

---

[4] Remicade is the brand name of the immunosuppressive drug infliximab which is used to treat conditions including rheumatoid arthritis. See https://www.remicade.com/.

needs ref for new rheumatologist sec[ondary] to ins[urance] issues." AR 575.

Regarding her cardiovascular system, the ALJ noted that Plaintiff had received a referral to a cardiologist and took nitroglycerin 2-3 times a day which helped relieve her symptoms. AR 29. An April 2015 chest x-ray showed no cardiopulmonary disease, leading the ALJ to conclude that her symptoms appeared to be controlled with medication and did not cause functional impairments greater than the RFC's limitations. Id., citing AR 597 ("pulmonary vasculature is within normal limits").

Plaintiff's briefing does not fully address the ALJ's finding that her back pain and cardiovascular disorders have been treated conservatively. Instead, Plaintiff argues that she cannot be faulted for receiving only two injections to treat her rheumatoid arthritis because of insurance issues and because more aggressive treatment is not available for rheumatoid arthritis or fibromyalgia. (JS at 13-14, 21.)

Her medical records show that Plaintiff first saw Dr. Anuntiyo in December 2014, at which point he ordered a "work up" to test Plaintiff for rheumatoid arthritis. AR 466. He also started her on the pain medicine gabapentin. Id. Plaintiff saw Dr. Anuntiyo again in January, March, June, and August 2015. AR 460-62, 464. On October 19, 2015, Plaintiff reported to another doctor that she had received two Remicade infusions but needed a referral to another rheumatologist due to insurance. AR 575. At the December 2015 hearing, she testified that after receiving two infusions, her insurance changed to Medi-Cal. AR 49-50. She also testified that the Remicade was helping. AR 50.

On November 10, 2015, she saw Dr. Robert Pallas. AR 540-41. His specialty is unclear, and it is also unclear if she was referred to him in response to her October request. He prescribed ibuprofen "prn" (i.e., as needed) for arthritis. AR 540. His handwritten assessment is difficult to read, but it appears to say, "RA," i.e., rheumatoid arthritis, along with other conditions under "assessment,"

"IV infusion for RA (Remicade)," and "IV IF for RA (Remicade?) 2 x 1 mo & methotrexate[5] [illegible] before [illegible]."[6] AR 541.

Substantial evidence supports the ALJ's finding that the conservativeness with which Plaintiff's symptoms have been treated over the years is inconsistent with the extreme degree of her alleged impairment. The record contains no discussion about surgical intervention or additional physical therapy for Plaintiff's back or heart conditions. AR 48, 51 (Plaintiff testified her back pain was treated with physical therapy and ibuprofen). Plaintiff's pain has been treated largely with ibuprofen and gabapentin. Plaintiff's arthritis pain improved with two Remicade infusions, but Plaintiff has not cited any records showing that she resumed this treatment after switching insurance or that her doctors prescribed any alternative therapies, such as adjusting her gabapentin dosage or referring her for specialized pain management or counselling.

## V.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: December 12, 2018

_____
KAREN E. SCOTT
United States Magistrate Judge

---

[5] This is another drug that can be used to treat rheumatoid arthritis. See https://www.mayoclinic.org/drugs-supplements/methotrexate-oral-route/proper-use/drg-20084837.

[6] After the ALJ's March 2016 decision, Plaintiff submitted to the Appeals Council a June 7, 2016 report from Dr. Anuntiyo and a June 14, 2016 RFC questionnaire from Dr. Pallas. AR 252 (letter brief). The Appeals Council did not consider the proposed new evidence, and Plaintiff did not submit it in support of her appeal to this Court. AR 2.

16